# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3089 | **DATE** | 9/24/2001 |
| **CASE TITLE** | John F. Valinote vs. Stephen R. Ballis | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter memorandum opinion and order. For the reasons stated, defendant Stephen R. Ballis's motion for summary judgment [31-1] is granted and plaintiff John F. Valinote's motion for summary judgment [33-1] is denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 3 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | SEP 2 5 2001 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 9/24/2001 date mailed notice | |
| IS | courtroom deputy's initials | 01 SEP 24 PM 4:15 | IS mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| JOHN F. VALINOTE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 00 C 3089 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| STEPHEN R. BALLIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

John Valinote and Stephen Ballis were members in the Omnibus Financial Group L.L.C., an unprofitable business. Pursuant to Section 10.B of Omnibus's operating agreement, Valinote exited Omnibus in March 2000 by transferring his membership interest in Omnibus to Ballis. After the transfer, Omnibus defaulted on a loan funded by Bank One, so Bank One debited $100,000 from Valinote's account by virtue of his personal guaranty of that loan.

Valinote demanded reimbursement of the $100,000 payment from Ballis pursuant to language in Omnibus's operating agreement, but Ballis refused. As a result, Valinote filed suit against Ballis for breach of contract, declaratory judgment, and reformation.

Presently before this Court are the parties' cross-motions for summary judgment for breach of contract and declaratory judgment (the reformation claim having been withdrawn). For the following reasons, this Court grants Ballis's Motion for Summary Judgment and denies Valinote's Motion for Summary Judgment.[1]

---

[1] The parties have consented to have this Court conduct any and all proceedings, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(b).

# I. Background

Valinote and Ballis formed Omnibus, a limited liability company, around March 1998 for the purpose of engaging in real estate ventures.[2] In connection with Omnibus's formation, Valinote and Ballis executed an operating agreement, which represented the governing document for Omnibus and for the relationship between Valinote and Ballis in their dealings with or on behalf of Omnibus.

On the day of its execution, the operating agreement listed Valinote and Ballis as each owning a fifty percent interest in the profits, losses, cash flow, and other benefits and avails of Omnibus. It recorded Valinote's and Ballis's initial capital contributions of $12,500 each to Omnibus, and it set the value of a one percent membership interest in Omnibus at $1000. As in the normal course, the operating agreement also included a multitude of provisions covering issues essential to the operation of business: voting rights, member duties, further contributions to capital, capital account adjustments, and so on.

In case a member wanted to exit Omnibus by transferring his interest in Omnibus to another member, the operating agreement provided a way to do so. If an Omnibus member simply wanted to withdraw or resign, the operating agreement included a specific section to cover that situation. In case of a dispute, the operating agreement stated that Illinois law governed the interpretation of the operating agreement.

From time to time, Omnibus would borrow funds to carry out its operations. Ordinarily, the loan agreements required Valinote or Ballis or both to deliver personal guarantees of

---

[2] The following facts are uncontroverted.

performance of Omnibus's obligations. For example, on one occasion Valinote executed a personal guaranty of performance of Omnibus's obligations under a $200,000 operating loan funded by Bank One. On another occasion, Valinote executed a personal guaranty of performance of Omnibus's obligations under a $400,000 land acquisition loan funded by Bank One. Neither loan would have been given but for the execution of Valinote's personal guaranty.

In January 2000, Valinote decided to leave Omnibus. He asked Ballis to propose an "exit strategy" involving Section 10.B of the operating agreement. Section 10.B, titled *Termination of Participation in Omnibus*, supplied a mechanism whereby an electing member could force a notified member to enter into a purchase or sale of membership interest, at the election of the notified member.[3] After some discussion, Ballis decided to invoke Section 10.B himself, thereby providing Valinote with the buy or sell option contained in Section 10.B.

The Section 10.B transfer formally commenced on February 10, 2000, when Ballis sent Valinote an Election for Termination of Participation in the Omnibus Financial Group L.L.C.

---

[3] Section 10.B stated:

> If for any reason any Member ("the Electing Member") is unwilling to continue to be a member of [Omnibus] if another Member ("the Notified Member") is also a member of [Omnibus], then the Electing Member may give the Notified Member written notice stating in such notice the value of a 1% Membership Interest ("Interest Value") whereupon the Notified Member shall, by written notice given to the Electing Member within 30 days from the date of receipt of the Electing Member's notice, elect either to purchase the Electing Member's interest in [Omnibus] or to sell to the Electing Member the Notified Member's interest in [Omnibus].

(Second Am. Compl. Ex. A at 18.)

Following the pricing formula set forth in Section 10.B,[4] Ballis offered to sell his interest in Omnibus to Valinote for $78,986.63.[5]

On February 15, 2000, Valinote reversed Ballis's proffered Section 10.B transfer, as expected, and Valinote formally elected to sell his interest in Omnibus to Ballis for zero dollars.[6]

---

[4] The purchase price to be paid for a selling member's interest in Omnibus pursuant to a Section 10.B transfer could be determined by taking:

   i. The Interest Value as stated in the Electing Member's notice multiplied by the selling Member's Membership Interest,
   ii. Plus or minus the amount, if any, by which the selling Member's Capital Account exceeds or is less than the buying Member's Capital Account,
   iii. Plus the amount, if any, of loans by the selling Member to [Omnibus],
   iv. Minus the amount, if any, of loans by [Omnibus] to the selling Member.

(*Id.* at 18-19.)

[5] Ballis came to that price using the following formula:

| | | |
|---|---|---|
| (Interest Value) x (Membership Interest) | = | ($79,064.25) |
| Plus or Minus Any Difference in Capital Accounts | = | 0 |
| Plus the Amount of Loans by Ballis to Omnibus | = | $158,050.55 |
| Minus the Amount of Loans by Omnibus to Ballis | = | 0 |
| Total Price | | $78,986.63 [sic] |

(Valinote Decl. Ex. F.)

[6] Ballis determined the price of Valinote's interest in Omnibus using the same formula:

| | | |
|---|---|---|
| (Interest Value) x (Membership Interest) | = | ($79,064.25) |
| Plus or Minus Any Difference in Capital Accounts | = | 0 |
| Plus the Amount of Loans by Valinote to Omnibus | = | $79.064.25 |
| Minus the Amount of Loans by Omnibus to Valinote | = | 0 |
| Total Price | | 0 |

(*Id.*)

The sale closed on March 20, 2000, and, from that point forward, Valinote ceased to be a member of Omnibus.[7]

On December 31, 2000, Omnibus defaulted on the $200,000 operating loan funded by Bank One. By letter dated February 8, 2001, Bank One exercised its rights under the Valinote personal guaranty and made demand on Valinote to pay $100,000. On March 9, 2001, Bank One debited $100,000 from Valinote's account.

Since Valinote believed that Ballis had assumed Valinote's obligations under the personal guaranty as a result of the Section 10.B transfer, Valinote, in turn, made demand on Ballis for reimbursement of the $100,000. Ballis refused to pay the $100,000. Moreover, Ballis refused to assume any of Valinote's obligations under personal guarantees entered into by Valinote or Ballis on behalf of Omnibus, stating that no provision in the operating agreement required him to do so.[8]

Consequently, Valinote filed suit in federal court alleging breach of contract, declaratory judgment, and reformation. The premise of all three claims was the same: By virtue of the Section 10.B transfer, Ballis had assumed Valinote's obligations under personal guarantees entered into by Valinote or Ballis on behalf of Omnibus. Two amended complaints and one Rule

---

[7] As an aside, the parties did not exchange any documents at the closing.

[8] For clarification, Valinote could have become liable under a personal guaranty in one of two ways: by executing the personal guaranty himself or by operation of Section 9.J. (*See* Second Am. Compl. Ex. A at 18.)

15(a) motion later, only the claims for breach of contract and declaratory judgment remain. The instant cross-motions for summary judgment concern both of these claims.[9]

## II. **Discussion**

### A. **Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is a fact that may affect the outcome of a claim under the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue as to a material fact exists only if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party. *Jackson v. Chi. Firefighters Union Local #2*, 99 C 1651, 2001 WL 726992, at *5 (N.D. Ill. June 27, 2001) (quoting *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 905 (7th Cir. 1990)). In determining whether a genuine issue of material fact exists, the court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *Shank v. William R. Hague, Inc.*, 192 F.3d 675, 681 (7th Cir. 1999).

The fact that both parties agree that the pertinent contract language is unambiguous attests to the propriety of a summary judgment ruling in the instant case. *See Colip v. Clare*, 26 F.3d 712, 716 (7th Cir. 1994); *Metalex Corp. v. Uniden Corp. of Am.*, 863 F.2d 1331, 1333 (7th

---

[9] Because Valinote's claim for breach of contract is identical to his claim for declaratory judgment, this Court will address both concurrently.

Cir. 1988). Interpretation of an unambiguous contract is a question of law for the court, and summary judgment based on the contract's plain meaning is appropriate, regardless of whether a party claims a divergent intent when the contract was executed or asserts a divergent interpretation of the contract in court. *Samuels v. Wilder*, 871 F.2d 1346, 1351 (7th Cir. 1989); *CSX Transp. v. Chi. & N. W. Transp. Co.*, No. 93 C 0168, 1994 WL 406546, at *2 (N.D. Ill. Aug. 1, 1994); 10B Charles Alan Wright et al., Federal Practice and Procedure § 2730.1, at 56-65 (3d ed. 1998).

### B. Breach of Contract/Declaratory Judgment

Under Illinois law, which both parties agree governs this case, the starting point of contract analysis is the language of the contract itself. *United States v. 4500 Audek Model Number 5601 AM/FM Clock Radios*, 220 F.3d 539, 542 (7th Cir. 2000); *Church v. Gen. Motors Corp.*, 74 F.3d 795, 799 (7th Cir. 1996). Ordinarily, the initial inquiry involves determining whether the language of the contract is ambiguous. *Id.* We need not delve into this matter, however, because the parties have already agreed that the pertinent language of the operating agreement is unambiguous.[10] (*See* Valinote's Local Rule 56.1 Statement of Material Facts ¶ 12.)

---

[10] The fact that Valinote and Ballis disagree on the interpretation of the pertinent language of the operating agreement does not render the language of the operating agreement ambiguous. *See Corn Prods. v. Cardinal Chem. Corp.*, 666 F. Supp. 1177, 1180 (N.D. Ill. 1987) (quoting *W.R. Lathom Tool & Mach. Co. v. Mut. Leasing Assocs., Inc.*, 435 N.E.2d 510, 512 (Ill. App. Ct. 1982)).

Given that the language of the operating agreement is unambiguous, extrinsic evidence of the parties' subjective intent will not be admitted to contradict or alter the operating agreement.[11] *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304-05 (7th Cir. 1994) ("If the written contract is clear without extrinsic evidence, then such evidence could have no office other than to contradict the writing . . . ."). Instead, we determine what the parties intended their obligations to be under the operating agreement based solely on the plain language of the operating agreement itself. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996); *CSX Transp., Inc. v. Chi. & N. W. Transp. Co.*, 62 F.3d 185, 189 (7th Cir. 1995). As a matter of course, the operating agreement must be interpreted as a whole so as to give meaning and effect to each provision in the operating agreement. *See Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 713 (7th Cir. 1993) (quoting *Mayfair Constr. Co. v. Waveland Assocs. Phase I Ltd. P'ship*, 619 N.E.2d 144, 152 (Ill. App. Ct. 1993)). In this sense, we presume that all provisions in the operating agreement were inserted for a purpose, and we must attempt to reconcile conflicting provisions, if possible, to effectuate their purposes. *See id.*

1.  Section 10.B

Seeing that the Valinote-Ballis transfer at issue was made pursuant to Section 10.B of the operating agreement, we begin our analysis there. Section 10.B expressly states that it governs the *Termination of Participation in Omnibus*, and it provides a certain buy-sell mechanism to effectuate that purpose. In short, if a member elects to terminate his interest in Omnibus, the

---

[11] Consequently, we disregard much of what Valinote has submitted as evidence in this case. (*See, e.g.*, Valinote Decl. Ex. D.)

- 8 -

other member can agree to purchase the electing member's interest in Omnibus or reverse the transfer, forcing the electing member to become the buyer.

Section 10.B goes on to state repeatedly that what is being terminated is the selling member's "interest in [Omnibus]," without expressly defining the phrase, and to set forth a formula to assess the value of a selling member's "interest in [Omnibus]," which we think is good evidence of the intent behind the phrase "interest in [Omnibus]."

As stated in Section 10.B, the value of a selling member's "interest in [Omnibus]" is determined by taking the Interest Value—as stated in the sole discretion of the electing member[12]—and by making adjustments in connection with the selling member's capital account, the selling member's loans to Omnibus, and the amount of loans from Omnibus to the selling member. (Second Am. Compl. Ex. A at 18-19.) In this case, after Valinote reversed the transfer, the numbers turned out to be ($79,064.25), zero, $79,064.25, and zero, respectively, of which the sum was zero dollars. (Valinote Decl. Ex. F.) In other words, in exchange for Valinote's "interest in [Omnibus]," Ballis gave Valinote no money at all.

It hardly needs repeating that Section 10.B does not expressly mention the selling member's personal guarantees, even though a value could easily be placed on such contingent obligations. Surely this finding militates against Valinote's position.[13] Further evidence that the

---

[12] The theory behind Section 10.B is "I cut, you choose." (*See supra* note 3.) The Interest Value, as determined by the electing member, remains fixed if the transfer is reversed.

[13] We dismiss Valinote's speculative statement that Ballis took into account all personal guarantees when he set the Interest Value. (*See* Valinote's Reply Mem. Law Supp. Cross-Mot. Summ. J. at 4-5.) "A party must present more than mere speculation or conjecture to defeat a summary judgment motion." *Borcky v. Maytag Corp.*, 248 F.3d 691, 697 (7th Cir. 2001)
(continued...)

parties intended to exclude personal guarantees from Section 10.B transfers is provided by what the parties did include in Section 10.B transfers: an adjustment for the amount of "loans by the selling Member to [Omnibus]" and an adjustment for the amount of "loans by [Omnibus] to the selling Member." (Second Am. Compl. Ex. A at 19.) After all, the loan adjustments of Section 10.B demonstrate that Valinote and Ballis knew how to address financial obligations relating to Omnibus when they intended on doing so. As it stands, the plain language of Section 10.B does not support Valinote's position that Ballis assumed Valinote's personal guaranty liability by virtue of the Section 10.B transfer.

### 2. Section 10.C

Section 10.C, which expressly lists the effect of a Section 10.B transfer, confirms the preceding conclusion. Section 10.C tells us that, upon consummation of the Section 10.B transfer at issue, three events occurred: (1) Ballis succeeded to Valinote's Capital Account and Membership Interest, (2) Ballis assumed and became liable for "all obligations of [Valinote] to [Omnibus]," and (3) Ballis agreed to hold Valinote and Valinote's property "free and harmless from any and all liability for such obligations." (*Id.*)

Skipping to the second event, we reject Valinote's position that the word "to" should be interpreted as "for the purpose of," so as to encompass his personal guarantee liability. The common and ordinary meaning of "to" as used in the context of borrowing and lending is "in a direction toward," as in when a borrower receives money pursuant to a loan funded by a lender,

---

[13](...continued)
(quoting *Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999)).

the borrower has an obligation to that lender. *See* Webster's II New Riverside University Dictionary 1214 (1994). Personal guarantees entered into by one party on behalf of some other party, on the other hand, are not obligations to the other party, they are obligations to the third party who lent money to the other party.

For example, as part of the Section 10.B transfer, Valinote agreed that the total value of his "loans to [Omnibus]" was $79,064.25—which comprised the value of a single loan that Valinote, as a lender, gave to (in the direction toward) Omnibus, as a borrower. (Incidentally, in his reply brief, Valinote himself used "to" in this sense when he discussed the $79,064.25 loan he made "to" (in the direction toward) Omnibus. (*See* Valinote's Reply Mem. Law Supp. Cross-Mot. Summ. J. at 5-6.)) Thus, as it turns out, we adopt the same common and ordinary meaning of "to" here that the parties have used throughout their business relationship.[14]

This conclusion necessarily dooms Valinote's argument that the indemnification language describing the third event encompasses personal guarantees. Specifically, Section 10.C states that the selling member shall "[a]ssume and become liable for all obligations of the selling Member to [Omnibus] and shall hold the selling Member . . . free and harmless from any and all liability for such obligations." (Second Am. Compl. Ex. A at 19.) Because the word "such"

---

[14] Given the intimate relationship between Section 10.B and Section 10.C, not to mention the fact that both sections pertain to the same event, it would be absurd to afford one meaning to "to" in Section 10.B and yet another meaning to "to" in Section 10.C as Valinote suggests. *See Preze v. Bd. of Trs., Pipefitters Welfare Fund Local 597*, 5 F.3d 272, 274 (7th Cir. 1993) (acknowledging that where two sections comprise a single article, all of the sections must be read together so as to read the article as a whole).

refers back to the obligations "to [Omnibus]," the indemnification language does not include obligations to third parties in the way of personal guarantees for the reasons stated above.[15]

   3.   Section 9.J

Section 9.J, which is the only section in the operating agreement that expressly addresses personal guarantees, comes into play in two distinct respects according to Valinote. In his response brief, Valinote asserts that Section 9.J defines an obligation to Omnibus, and therefore, an obligation that falls within the obligations assumed under Section 10.C. (Valinote's Mem. Law Opp'n Ballis's Mot. Summ. J. at 7.) But in his reply brief, Valinote asserts that Section 9.J, by itself, operated to automatically transfer Valinote's liability under any and all personal guarantees to Ballis upon the consummation of the Section 10.B transfer. (Valinote's Reply Mem. Law Supp. Cross-Mot. Summ. J. at 7.)

As for the former, we find no basis for Valinote's tortured interpretation. Section 9.J states that "[t]he Members covenant and agree that if any Member executes and delivers any [personal] guarantee and if such guaranteeing Member incurs any cost or liability in connection therewith, then such cost shall be allocated among and shared by all of the Members in accordance with their respective Membership Interests." (Second Am. Compl. Ex. A at 18.) Plainly, Section 9.J creates an obligation among Omnibus members to each other, but in no sense

---

[15] We note that Section 10.B and Section 10.C have different purposes, only to point out our disagreement with Valinote's suggestion that the exclusion of personal guarantees from Section 10.C renders Section 10.C superfluous. The purpose of Section 10.B is to affix a price to the selling member's interest in Omnibus, while the purpose of Section 10.C is to inform the buying member of his rights and obligations upon consummation of the purchase. (*See* Second Am. Compl. Ex. A at 18-19.)

- 12 -

can Section 9.J be deemed to create an obligation between Omnibus and some Omnibus member. Indeed, the pertinent language does not even mention Omnibus as a party to the Section 9.J covenant (as it would defy logic to do so since Omnibus could not be liable under a personal guaranty entered into on its behalf). Section 9.J simply states that the members are parties to the covenant, and the word member is not synonymous with Omnibus as per the operating agreement. (*See, e.g.*, Second Am. Compl. Ex. A at 1.)

Valinote's contention that Section 9.J operated, by itself, to automatically transfer his liability under any and all personal guaranties to Ballis upon the consummation of the Section 10.B transfer is unpersuasive as well. According to Valinote, the admission or termination of an Omnibus member triggers Section 9.J, which takes the total amount of personal guaranty liability and automatically allocates it to the total number of then existing Omnibus members based on their membership interests. (Valinote Reply Mem. Law Supp. Cross-Mot. Summ. J. at 7.) Since a terminated Omnibus member has no membership interest, the argument goes, a terminated Omnibus member bears no personal guaranty liability. Although Ballis agrees that a new Omnibus member would share in liability under preexisting personal guaranties according to his membership interest via Section 9.J, he disagrees that a terminating member can absolve himself of personal guaranty liability via Section 9.J.

The language of Section 9.J expressly states that it applies to Omnibus members. An Omnibus member is defined in the operating agreement as the parties named in the operating agreement—i.e., Valinote and Ballis—and additional Omnibus members that may be added from time to time. (Second Am. Compl. Ex. A at 25.) The exclusion of former Omnibus members from the definition and thus from Section 9.J undermines Valinote's interpretation. Further, the

fact that Section 9.J itself reveals no intention of automatic application upon the consummation of a Section 10.B transfer impugns Valinote's position.

Valinote contends that no rationale supports Ballis's interpretation of Section 9.J. We can think of at least one important rationale. Section 9.J offers protection to Omnibus members who assume the risk of personal guaranty liability to further the interests of Omnibus (for the benefit of all current and future members). Specifically, as the language of Section 9.J explains, it operates to spread the risk of personal guaranty liability among all Omnibus members in accordance with their membership interests at the time the risk is assumed. If new members join Omnibus, then the risk is allocated further—prior Omnibus members find themselves in a better position.[16]

Understood this way, to allow Omnibus members to absolve themselves of personal guaranty liability simply by terminating their participation in Omnibus, would be to render the protection afforded under Section 9.J meaningless, especially in the absence of a provision requiring the exiting member to provide other members or former members with compensation to cover their increased exposure to personal liability. As a result, it makes perfect sense that under no circumstances can an exiting Omnibus member unilaterally employ Section 9.J to increase another member's or former member's share of personal guaranty liability. Hence, Valinote's argument must fall.[17]

---

[16] Hence, Section 9.J only allocates risk of personal guaranty liability on two occasions: one being when an Omnibus member executes a personal guaranty on behalf of Omnibus, and the other being when a new Omnibus member agrees to be bound by the operating agreement.

[17] As an aside, we acknowledge that determining an individual's allocation of personal
(continued...)

- 14 -

4. Section 11.C

In light of our interpretation of the operating agreement thus far, we briefly address Valinote's argument relating to Section 11.C. Section 11.C covers the situation where an Omnibus member unilaterally decides to withdraw or resign his membership in Omnibus. It provides that, upon the occurrence of either withdrawal or resignation, the withdrawing or resigning member will "forfeit all further interest in [Omnibus]," but will not "be relieved of or released from any personal guarantees or other personal covenants undertaken by [him] to the extent not fulfilled as of the withdrawal or resignation." (Second Am. Compl. Ex. A at 20.) As Valinote's exit strategy encompassed a Section 10.B transfer, he does not contend that Section 11.C applied or should have applied. Rather, Valinote points us to Section 11.C and asks the rhetorical question: why would I have elected to exit using Section 10.B rather than Section 11.C?

In hindsight, a glance at the numbers gives Valinote's argument some appeal. If Valinote had left in March 2000 via Section 11.C, he would have retained his right to receive $79,064.25, and he would have remained liable for certain personal guarantees. By leaving pursuant to Section 10.B, in contrast, Valinote relinquished his right to receive $79,064.25 and remained liable for the same personal guarantees.

---

[17](...continued)
guaranty liability at the time the liability is certain may involve some difficulty, considering that both then existing and former Omnibus members may fall into the equation. The starting point would be to allocate liability to the individuals who were Omnibus members at the time the personal guaranty was made. Then, adjustments would need to be made for individuals who became members of Omnibus after that date, which ensures that all of the members share in the liability. (*See* Second Am. Compl. Ex. A at 18.)

Nonetheless, disregarding the benefit (or detriment, depending on one's opinion) of hindsight and focusing on the parties' intent at the time of execution, as contract principles require us to do, we are confident that our interpretation of the operating agreement is correct for the reasons stated throughout this decision. *See Conn. Gen. Life Ins. Co. v. Chi. Title & Trust Co.*, 714 F.2d 48, 50 (7th Cir. 1983); *Perry v. Cmty. Action Servs.*, 82 F. Supp. 2d 892, 896 (N.D. Ill. 2000). Contrary to Valinote's position, a court's interpretation of a contract need not endorse each and every business decision to be logical and make sense. Poor business decisions are often made.

Lest we be charged with rendering language in Section 11.C superfluous or creating a conflict between the language of Section 11.C and Section 10.C, we state that Section 11.C is distinct from Section 10.C, as each section is written to explain the effect of an entirely different event. Furthermore, rather than creating a conflict, our interpretation of Section 9.J, Section 10.B, Section 10.C, and Section 11.C avoids a conflict—under no situation can an exiting Omnibus member force his share of personal guaranty liability upon remaining or former Omnibus members. The mere fact that our interpretation of the operating agreement means that Section 11.C includes some language pertaining to personal guarantees that reinforces Section 9.J causes no concern. *See Sanders v. Scheideler*, 816 F. Supp. 1338, 1345 (W.D. Wis. 1993); *Biever Motor Car Co. v. Chrysler Corp.*, 108 F. Supp. 948, 951 (D. Conn. 1952).

### III. Conclusion

For the reasons stated, this Court grants Ballis's Motion for Summary Judgment and denies Valinote's Motion for Summary Judgment.

**ENTER ORDER:**

*[signature]*
MARTIN C. ASHMAN
United States Magistrate Judge

**Dated:** September 24, 2001.

Copies have been mailed to:

| | |
|---|---|
| MARK S. GREGORY, Esq.<br>Kelley Drye & Warren, L.L.P.<br>Two Stamford Plaza<br>281 Tresser Boulevard<br>Stamford, CT 06901 | JAY R. HOFFMAN, Esq.<br>19 South LaSalle Street<br>Suite 802<br>Chicago, IL 60603 |
| CHRISTOPHER T. SHEEAN, Esq.<br>Kelley Drye & Warren, L.L.P.<br>303 West Madison Street<br>Suite 1400<br>Chicago, IL 60606 | |
| Attorneys for Plaintiff | Attorney for Defendant |